IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON

| | |
|---|---|
| In the Matter of the Search of ) | Case No. 2:21-mj-00072 |
| The Premises Located at ) | |
| 6325 Emerson Avenue, ) | |
| Parkersburg, West Virginia 26104 ) | Filed under seal |

### AFFIDAVIT IN SUPPORT OF SEARCH WARRANT APPLICATION

I, Kevin McLinden, being first duly sworn state:

### INTRODUCTION

1. Your affiant is a Special Agent with the Department of Homeland Security, Homeland Security Investigations ("HSI"), currently assigned to the HSI Charleston, West Virginia office. I have been so employed since December 2019. Prior to my employment with HSI, I worked as a Criminal Investigator since July 2013, as a Special Agent with Diplomatic Security Service, and a Deputy U.S. Marshal with the U.S. Marshal's Service. I attended and graduated the Federal Law Enforcement Center's Criminal Investigator Training Program, the Deputy U.S. Marshal's Academy as well as the HSI Special Agent Training course. I also hold two master's degrees in Public Administration and Homeland Security. As part of my education and training, I received instruction on bringing in and harboring certain aliens in the United States.

2. As part of my duties as a Special Agent with HSI, I investigate violations of federal law, including acts relating to harboring certain aliens in the United States. Based on my training and experience, I am aware that it is a federal criminal offense to knowingly or recklessly disregard the fact that an alien has entered or remains in the United States and to conceal, harbor, shield from

1

detection or attempt to conceal, harbor or shield from detection any such alien in any place, including any building or by any means of transportation.

3. As a Special Agent, I have attended training and seminars that centered on alien transport and harboring and I have participated in alien harboring investigations, including observing forensic interviews of aliens who have been harbored. Such offenses related to harboring aliens include violations of 8 U.S.C. §§ 1324(a)(1)(A)(iii) and 1324(a)(1)(B)(i), which prohibit the knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, such alien in any place, including any building or any means of transportation for financial gain. Based on my training and experience, I have knowledge of the means and techniques that individuals engaging in criminal activities such as alien harboring use to conceal their activities.

4. I am a federal law enforcement officer who is engaged in enforcing the criminal laws, including 8 U.S.C. §§ 1324(a)(1)(A)(iii) and 1324(a)(1)(B)(i), and I am authorized by law to request a search warrant.

## PURPOSE OF THIS AFFIDAVIT

5. This Affidavit is made in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant for the locations specifically described in Attachment A of this Affidavit, including those properties and/or persons listed below (collectively the "SUBJECT PREMISES") for contraband and evidence, fruits, and instrumentalities of violations of 8 U.S.C. § 1324(a)(1)(A)(iii) and 1324(a)(1)(B)(i) (prohibition against harboring certain aliens for financial

gain) which are more specifically described in Attachment B of this Affidavit and Application. Those premises to be searched include:

    a. The entire premises at 6325 Emerson Ave, Parkersburg, West Virginia 26104 ("SUBJECT PREMISES") and further described in Attachment A. This includes annexes, garages, carports, the outside yard, curtilage, mailboxes, trash containers, debris boxes, sheds and outbuildings located therein;

    b. Vehicles under the custody and control of Advanced Analytical Solutions ("AAS"), the business located at 6325 Emerson Ave, Parkersburg, West Virginia 26104, and which are located at the SUBJECT PREMISES;

    c. The content of computers and electronic storage devices located and seized therein, including any surveillance video recordings from the surveillance cameras and system that is located at the SUBJECT PREMISES;

    d. The content of any locked cabinets, containers, drawers, boxes or other receptacles large enough for paper record retention or electronic storage devices located therein.

6. Located within the SUBJECT PREMISES to be searched, your affiant seeks to locate persons, seize evidence, contraband, fruits of crime, and instrumentalities of criminal violations, which relate to harboring aliens, as further described in Attachment B to this Affidavit and Application.

7. Moreover, it has been my experience that suspects in these types of alien harboring investigations often transport victims, property, and items used to facilitate the harboring, such as fake identification documents, via their vehicles and store them inside of those vehicles. I am

familiar with past investigations in which computers, documents, storage devices, electronic media, and records were found inside suspects' vehicles. I therefore request that the warrant authorize investigators to search any vehicles that are registered to Advanced Analytical Solutions LLC or its owner, Fred Anderson, which appear to be under his dominion or control and are located at the SUBJECT PREMISES.

8. From my background and experience, I know that individuals who own businesses normally maintain records of their financial activity, such as receipts for expenditures by cash and check, bank records, tax returns, escrow files, and other financial documents, in their places of business. I am also aware that individuals engaged in illegal activity such as harboring often engage in the activity for financial gain and they often possess computers, documents, storage devices, and electronic media used in the commission of the crime. Further, as set forth below, it is your affiant's understanding that Advanced Analytical Solutions and Fred Anderson have been known to use computers and other electronic devices for payroll and for record keeping.

9. The statements in this Affidavit are based in part on information provided by other investigators, state and local law enforcement officers and investigators, witnesses, financial records, as well as my own investigation of this matter. Since this Affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that contraband and evidence, fruits, and instrumentalities of violations or attempted violations of 8 U.S.C. §§ 1324(a)(1)(A)(iii) and 1324(a)(1)(B)(i) (prohibition against harboring certain aliens and harboring for financial gain) are presently located in the SUBJECT PREMISES.

## STATUTORY AUTHORITY

10. As noted above, this investigation concerns alleged violations of the following:

    a. 8 U.S.C. § 1324(a)(1)(A)(iii) and 1324(a)(1)(B)(i) prohibit knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, concealing, harboring, or shielding from detection, or attempting to conceal, harbor, or shield from detection, such alien in any place, including any building or any means of transportation for financial gain.

    Moreover, pursuant to that statute, prima facie evidence that an alien involved in the alleged violation under subsection (a) has not received prior official authorization to come to, enter, or reside in the United States or that such alien had come to, entered, or remained in the United States in violation of law includes:

    (A) Records of any judicial or administrative proceeding in which that alien's status was an issue and in which it was determined that the alien had not received prior official authorization to come to, enter, or reside in the United States or that such alien had come to, entered, or remained in the United States in violation of law.

    (B) Official records of the Service or of the Department of State showing that the alien had not received prior official authorization to come to, enter, or reside in the United States or that such alien had come to, entered, or remained in the United States in violation of law.

(C) Testimony, by an immigration officer having personal knowledge of the facts concerning that alien's status, that the alien had not received prior official authorization to come to, enter, or reside in the United States or that such alien had come to, entered, or remained in the United States in violation of law.

8 U.S.C. § 1324(b)(3).

## DEFINITIONS

11. The following definitions apply to this Affidavit and Attachment B:

    a. **"Alien,"** as used herein, means any person not a citizen or national of the United States and its use herein is consistent with the language of the statute which the criminal conduct at issue in this investigation violated: 8 U.S.C. § 1324. *See* 8 U.S.C. § 1101(a)(3).

    b. **"Computer,"** as used herein, refers to "an electronic, magnetic, optical, electrochemical, or other high-speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device" and includes smartphones, other mobile phones, and other mobile devices. *See* 18 U.S.C. § 1030(e)(1).

    c. The terms **"records," "documents,"** and **"materials,"** as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade form (including, but not limited to, writings, drawings, paintings), photographic form (including, but not limited to, microfilm,

6

microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies), mechanical form (including, but not limited to, phonograph records, printing, typing) or electrical, electronic or magnetic form (including, but not limited to, tape recordings, cassettes, compact disks, electronic or magnetic storage devices such as floppy diskettes, hard disks, CD-ROMs, digital video disks (DVDs), Personal Digital Assistants (PDAs), Multi Media Cards (MMCs), memory sticks, optical disks, printer buffers, smart cards, memory calculators, electronic dialers, Bernoulli drives, or electronic notebooks, as well as digital data files and printouts or readouts from any magnetic, electrical or electronic storage device).

## BACKGROUND ON ADVANCED ANALYTICAL SOLUTIONS

12. Advanced Analytical Solutions LLC ("AAS") is a business that currently operates in Parkersburg, West Virginia. AAS is registered with the West Virginia Secretary of State as a limited liability company. It was first registered in 2008 as a domestic profit business. The purpose of AAS, per its registration with the Secretary of State is manufacturing and basic chemical manufacturing.

13. AAS has operated for approximately nineteen years, according to its website, advancedqa.com. AAS states that it provides "both single-blind and double-blind" performance evaluation programs. AAS also claims that it provides "concentrated and whole volume" water pollution, water supply, and whole volume solid waste quality control standards. AAS formerly sub-contracted with The Chemours Company, which is based in Wilmington, Delaware.

14. AAS operates out of a business facility located at 6325 Emerson Avenue in Parkersburg, West Virginia, 26104-4090. This address is confirmed on its website as well as listed as

7

the principal office address on its West Virginia Secretary of State registration. The business location is within Wood County, which is within the Southern District of West Virginia. AAS is owned and operated by Fred Anderson and a business partner named J▮▮ C▮▮.

## BACKGROUND OF INVESTIGATION AND PROBABLE CAUSE TO SEARCH THE PROPERTY DESCRIBED IN ATTACHMENT A AND TO SEIZE THE PROPERTY DESCRIBED IN ATTACHMENT B

15. Your affiant believes that the information contained in this Affidavit provides probable cause to believe that, for the past ten years up to present day, FRED ANDERSON, operating Advanced Analytical Solutions LLC ("AAS"), used his place of business to harbor at least one alien, S.A., for financial gain in violation of 8 U.S.C. §§ 1324(a)(1)(A)(iii) and 1324(a)(1)(B)(i).

16. In or about April 2021, HSI began investigating the presence of a Madagascar foreign national, S.A. ("S.A."), in the Parkersburg area. Through investigation, surveillance, and witness interviews, your affiant learned that S.A. resided at the main office building of AAS, also the SUBJECT PREMISES. Your affiant conducted surveillance on that building and observed a single-story commercial business with a gravel parking lot in front of the commercial business on Route 68 in Parkersburg, West Virginia. Your affiant recorded the license plate of one vehicle that was parked in the parking spot directly in front of AAS and later found that this vehicle was registered to Anderson.

17. On or about May 12, 2021, your affiant met with S.A. at a location outside of the SUBJECT PREMISES. S.A. informed your affiant that she originally came to the United States from Madagascar in or about 2000, on a student visa to study for an advanced degree at the Ohio State University. S.A. stated that she was a government civil servant in Madagascar and her work related to education administration. S.A. stated that she met Fred Anderson on a singles' dating site

8

while she was studying in Ohio and that they initiated a romantic relationship. Together, S.A. and Fred Anderson moved into the home of Anderson's mother in Parkersburg.

18. S.A. stated that after she obtained her degree in the United States, she briefly returned to Madagascar. S.A. stated that she desired to return to the United States for a better life and to continue her studies. S.A. and Fred Anderson applied for and obtained a K-1 fiancé visa in 2011. A K-1 fiancé visa allows the engaged partner of a United States citizen to enter the United States, as long as the couple gets married no more than ninety days later. The newly married spouse can then apply for permanent residence (a "green card") based on marriage. S.A. stated that she entered the United States on or about January 8, 2011, on the K-1 visa and that Fred Anderson greeted her at the Pittsburgh airport and brought her to the office of Advanced Analytical Solutions in Parkersburg, West Virginia, where he told her that he resided. Fred Anderson also told S.A. that she would reside in the office building with him.

19. S.A. stated that shortly after her arrival in Parkersburg on the K-1 visa, Fred Anderson told her that he did not want or intend to marry her, however, he promised to do what he could to help S.A. get a green card. S.A. remained with Fred Anderson, who told her not to worry about immigration consequences and that immigration restrictions did not apply to intelligent, educated people like her.

20. S.A. remained residing in the office building of Advanced Analytical Solutions in Parkersburg for approximately the next decade, until she left on or about May 12, 2021. While at the SUBJECT PREMISES, S.A. worked for Fred Anderson by providing office administrative support, including unlocking the business in the morning for other employees, cleaning the office, filling out paperwork, and receiving packages on behalf of the business in the evening. S.A. reported that Fred

Anderson did not pay her for her services but that he did provide her a place to stay. S.A. did not have access to a shower during the approximate decade that she resided at the SUBJECT PREMISES and instead washed herself with baby wipes, which she provided Fred Anderson with money to buy.

21. S.A. was aware during the approximate decade in which she resided at the SUBJECT PREMISES in Parkersburg that her visa had expired and that she no longer had valid paperwork to remain in the United States. S.A. also told Fred Anderson that her visa was expired. S.A. stated that Fred Anderson encouraged her to remain in the United States and allowed her to continue residing at the SUBJECT PREMISES.

22. During her time at the office in Parkersburg, S.A. also helped edit books written by Fred Anderson's business partner, J▆ C▆ ("C▆"). S.A. told C▆ about her immigration status and her expired visa, but C▆ also encouraged S.A. to remain at the SUBJECT PREMISES and told her that she should not worry about immigration restrictions due to the skills and intelligence that she possessed. S.A. stated that whenever she became frustrated with her situation and talked about leaving the country, Anderson and C▆ would talk her down and discourage her from leaving and implore her to stay.

23. S.A. stated that in 2015, she told Fred Anderson that she wanted to apply for self-deportation but that he discouraged her from doing so and told her that she should remain in the United States and pursue her education and a meaningful career through work. As a result, S.A. did not apply for self-deportation.

24. In or about late-2020, S.A. contacted an immigration attorney to obtain assistance in getting her immigration status in the United States sorted out.

25. S.A. was aware that your affiant visited the SUBJECT PREMISES where she lived and worked and she stated that when each visit occurred, she was fearful of being discovered and so she hid to avoid detection.

26. S.A. stated that Fred Anderson used her to open numerous credit cards and that she believed he kept the credit cards in a safe in the offices of AAS. S.A. also stated that she had USB external hard drives stores around the SUBJECT PREMISES, which held communications between her and Fred Anderson and more information regarding those credit cards.

27. After HSI began investigating, S.A. stated that Fred Anderson and C███ confronted her in a conference room at the SUBJECT PREMISES and told her that she had created "trouble" for herself by letting people know about her immigration situation. S.A. stated that Fred Anderson and C███ acted as if they had to fix the situation and told her not to make any phone calls.

28. On or about April 13, 2021, your affiant met with Fred Anderson to review financial records of AAS pursuant to a Notice of Inspection. When communicating with your affiant, Fred Anderson stated that AAS does not employee any foreign nationals. During this visit, your affiant observed home furnishings throughout the AAS building at the SUBJECT PREMISES as well as high-tech security room consisting of at least nine security cameras that appeared to be operations.

29. On or about May 5, 2021, your affiant conducted a consensual interview with Fred Anderson at the SUBJECT PREMISES. Fred Anderson initially claimed that S.A. entered the country as a student in 2011 on a student visa to Ohio University. Fred Anderson told your affiant that S.A. lived on campus in dorms and moved into Fred Anderson's private residence in 2015, where she resided until their relationship ended a year prior in 2020. During the interview, Fred Anderson changed his timeline and earlier statements – he admitted that he filed for a K-1 fiancé

11

visa for S.A. However, Fred Anderson claimed that K-1 visa filing date was 2017, but your affiant's records reflect the actual date of the petition was 2011. Fred Anderson confirmed a photograph that he was shown was indeed S.A. Fred Anderson later admitted that S.A. had lived in the AAS building as early as 2017.

30. In his interview, Fred Anderson admitted he never paid S.A. nor provided her any medical or dental benefits. Fred Anderson justified his non-payments to SA. as being in return for providing her free room and board. Fred Anderson described S.A.'s living quarters as consisting of a back bedroom in the SUBJECT PREMISES that was without an operational shower. Fred Anderson stated S.A. did not have a car or other means of transportation.

31. During his interview, Fred Anderson stated that S.A. left him in November 2020. Your affiant inquired when was the last time that Fred Anderson saw S.A. and observed him to be evasive and unable to provide a clear answer. Fred Anderson was also unable to provide clear answers to inquiries about S.A.'s phone number, new address, or other new contact information.

32. Your affiant requested a tour of the AAS facility located at the SUBJECT PREMISES. Fred Anderson showed your affiant a back room in the building where he claimed that S.A. previously resided inside the SUBJECT PREMISES. Your affiant observed a bedroom set and clothes. Fred Anderson claimed he lived in that room. Your affiant did not observe S.A. during that visit at AAS.

33. Records reviewed by your affiant pursuant to this investigation establish that S.A. first entered the United States in July 2000 as an exchange student on a J-1 visa at the University of Ohio. However, records also demonstrate that S.A. entered the United States a second time on a fiancé K-1 visa issued in November 2010 and that expired in or about April 2011. The United States

12

petitioner listed on the K-1 visa is Frederick S. Anderson. Records do not reflect a marriage between S.A. and Fred Anderson.

34. On or about May 11, 2021, your affiant conducted a consensual interview with former AAS employee, B. Rake ("Rake"). Rake worked for AAS from in or about October 2020 until in or about January 2021. Rake stated that she witnessed S.A. living and working inside the SUBJECT PREMISES the entire time Rake was employed by Anderson and worked at AAS. Rake stated she witnessed Anderson trying to move S.A. to the residence of C▓▓ at one point. Rake disclosed that Anderson operated a camera system throughout the SUBJECT PREMISES and he used it to observe S.A.'s movements around the property. Rake stated that Anderson views this surveillance footage inside a server room located at the SUBJECT PREMISES, and that the room has a security camera display system. Through investigation, your affiant has learned that Fred Anderson controls this system and can access it.

## CONCLUSION

35. Based on the foregoing, there is probable cause to believe that the federal criminal statutes cited herein have been violated, and that the contraband, property, evidence, fruits and instrumentalities of these offenses, more fully described in Attachment B, are located at the locations described in Attachment A. I respectfully request that this Court issue a search warrant for the locations described in Attachment A, authorizing the seizure and search of the items described in Attachment B.

36. I am aware that the recovery of data by a computer forensic analyst takes significant time; much the way recovery of narcotics must later be forensically evaluated in a lab, digital evidence will also undergo a similar process. For this reason, the "return" inventory will contain a

list of only the tangible items recovered from the premises. Unless otherwise ordered by the Court, the return will not include evidence later examined by a forensic analyst.

Respectfully submitted,

_____
KEVIN MCLINDEN
SPECIAL AGENT
HOMELAND SECURITY INVESTIGATIONS

Subscribed and sworn-to by the Affiant telephonically in accordance with the procedures of Rule 4.1 of the Federal Rules of Criminal Procedure, on ____May 26, 2021____, 2021.

_____
HON. DWANE L. TINSLEY
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF WEST VIRGINIA

## ATTACHMENT A

**Premises and Property to Be Searched**

The premises to be searched is located at 6325 Emerson Avenue, Parkersburg, West Virginia, 26104 (the SUBJECT PREMISES). The main structure at the subject premises is more particularly described as a one-story dark-tan structure with corrugated metal siding and a metal roof. Advanced Analytical Solutions LLC is the sole occupant of this main structure at the SUBJECT PREMISES. The roof of the SUBJECT PREMISES appears to be flat and appears to have no notable pitch when viewed from the road.

The SUBJECT PREMISES is accessed by a paved driveway up a short hill that is directly off of Emerson Avenue, which is also known as Route 68. There is a parking lot that is directly adjacent to the main structure that is closest to the driveway. On one side of the driveway is a telephone pole and on the opposite side of the driveway is a fire hydrant and a speed limit sign which indicates the posted speed limit on Emerson Avenue as being 55.

The SUBJECT PREMISES is located near the intersection of Emerson Avenue and the I-77 interstate highway. The SUBJECT PREMISES is surrounded by shrubs and trees on its back two sides. The side that faces the road appears to have a flat area of grassland before more shrubs and small trees create a barrier downhill to Emerson Avenue. Two mailboxes appear to be at the top of the driveway next to the parking lot of the SUBJECT PREMISES.

Below is a color photograph and an aerial view of the SUBJECT PREMISES:

1



The above image was taken from Google Maps in May 2021. A red pin has been dropped on the SUBJECT PREMISES.



In addition to the entire property located at the SUBJECT PREMISES, other items to be searched pursuant to the Warrant include:

a. The content of computers and electronic storage devices located and seized therein, which are under the dominion, control, or use of Advanced Analytical Solutions LLC, including video surveillance recordings and systems as well as electronic payroll and accounting systems;

b. The content of any locked cabinets, containers, drawers, boxes or other receptacles large enough for paper record retention or electronic storage devices located therein;

c. Vehicles which are parked on the SUBJECT PREMISES in the parking lot directly adjacent to the main structure and which are under the dominion and control of Advanced Analytical Solutions or the owner of Advanced Analytical Solutions, Fred Anderson.

## ATTACHMENT B

### Description of Items to be Searched for and Seized

The following items constitute evidence, fruits, proceeds, and instrumentalities of violations of 8 U.S.C. §§ 1324(a)(1)(A)(iii) and 1324(a)(1)(B)(i) (prohibiting the knowing or reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, such alien in any place, including any building or any means of transportation, for financial gain):

1. Records, information, and items relating to violations of the statute described above including:

    a. Records, information, and items relating to the occupancy or ownership of the SUBJECT PREMISES, 6325 Emerson Ave, Parkersburg, WV 26104, including utility and telephone bills, mail envelopes, or addressed correspondence;

    b. Records, information, and items relating to the ownership or use of computer equipment and video surveillance equipment and systems found in the above residence, including sales receipts, bills for Internet access, and handwritten notes;

    c. Records and information relating to the identity or location of the persons suspected of violating the statute described above, including owners of Advanced Analytical Solutions LLC such as Fred Anderson;

    d. Any documents (both valid and false) relating to identity of Madagascar foreign national, S.A. ("S.A."), including but not limited to her birth certificate, licenses, and other paperwork bearing her name and personal identifiers, which are known to law enforcement;

    e. Any and all evidence of alien harboring, accomplices or aiders and abettors associated with facilitating the harboring of S.A. for financial gain or any other harbored person located at the Advanced Analytical Solutions LLC SUBJECT PREMISES, including but not limited to all identification cards

4

(both valid and false identification cards/documents), luggage tags, suitcases, paperwork, diaries, journals, photographs, correspondence.

f. Employment records for Advanced Analytical Solutions LLC, including:

   i. Payroll journals
   ii. All W-2s and forms 1099s issued
   iii. All checks or other payment documents issued as salary, commission, bonus, guaranteed partner payments, or other earned income payments

2. Computer systems and/or their components, which include but are not limited to:

   a. All computer hardware capable of collecting, analyzing, creating, displaying, converting, storing, concealing, or transmitting any of the items referenced in above paragraphs 2(a – f);

   b. All non-commercially produced video tapes or digital records and all video and surveillance recording equipment.

   c. All digital cameras and SD cards or other electronic storage media used to save digital photo images or videos made by the surveillance system at the SUBJECT PREMISES.

   d. Any magnetic, electronic or optical storage device capable of storing data related to business records such as electronic accounting books or ledgers or payroll information, or information on credit card bills and receipts as described by S.A., such as floppy disks, hard disks, tapes, CD-ROMs, CD-R, CD-RWs, DVDs, optical 2 disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, and personal digital assistants;

   e. Any documentation, operating logs and reference manuals regarding the operation of the computer equipment, storage devices or software to allow the investigators to properly access said equipment;

   f. Any applications, utility programs, compliers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices, or data to be searched;

   g. Any physical keys, encryption devices, or similar physical items that are necessary to gain access to the computer financial business-records keeping equipment, storage devices or data; and

5

      h. Any passwords, password files, test keys, encryption codes or other information necessary to access the computer equipment, storage devices or data.

3. Personal telephone books, telephone records, telephone bills, address books, correspondence, notes, and papers containing names and/or telephone numbers that tends to establish communication between co-conspirators, in this case, persons who facilitate and work together to conceal and harbor at least one alien, S.A..

4. Indicia of occupancy, residency, and/or ownership of the items noted above and of the premises, including but not limited to, papers, correspondence, canceled envelopes, canceled postcards, bills, and registration documents.

5. Any safes, locked cabinets, and/or other secured containers and/or devices at the locations and in/on vehicles identified in Attachment A. Law enforcement shall be permitted to open such locked containers by force or through the use of a locksmith if necessary.

6. Travel documents to include visa, passports, visa applications and other records used in furtherance of claims for United States immigration benefits.

Moreover, the seizure of computer systems and/or their components as set forth herein is specifically authorized by this search warrant, not only to the extent that such computer systems constitute instrumentalities of the criminal activity described above, but also for the purpose of the conducting of off-site examinations of their contents for evidence, instrumentalities, or fruits of the aforementioned crimes.

6